# Fritz, Appellant, *v.* Sax & Abbott Construction Company.

*Negligence—Master and servant—Building—Collapse—Death—Judgment for defendant n. o. v.*

In an action to recover damages for the death of plaintiff's husband, an employee of the defendant company, which death was occasioned by the collapse of a part of a building on which he was working, alleged to be due to improper shoring, judgment is properly entered for the defendant non obstante veredicto where it appeared that the deceased was the superintendent in charge of the entire work and as such had equal opportunity with his superiors of remedying defects in the shoring if any existed, and further that the evidence in the case was insufficient to justify the opinion that the fall of the building was owing to defects in the shoring.

Argued March 30, 1914. Appeal, No. 25, Jan. T., 1914, by plaintiff, from judgment of C. P. No. 4, Philadelphia Co., June T., 1910, No. 1724, for defendant n. o. v. in case of Harriet Fritz, widow of Peter Fritz v. Sax & Abbott Construction Company. Before FELL, C. J., MESTREZAT, POTTER, ELKIN and MOSCHZISKER, JJ. Affirmed.

Trespass to recover damages for the death of plaintiff's husband.

The facts appear in the following opinion of WILLSON, P. J., sur defendant's motion for a new trial and for judgment n. o. v.:

The defendant company in the year 1909, under a contract with the United Gas Improvement Company, was engaged in alteration and reconstruction of two buildings at the northeast corner of Eleventh and Market streets in this city. Plans had been prepared by a firm of architects for the work to be done, and the defendant company, by the terms of the written contract, undertook to do the work in accordance with the plans referred to and under the supervision and direction of the architects. The plans referred to called for the removal of the lower stories of the brick wall on Eleventh street and Market street in the prosecution of the alterations, and such removal necessitated the placing of shoring in and outside of the building for the purpose of holding in place such portions of the upper part of the wall and of the upper portion of the building as remained in place while the changes were being made in the lower portions. This work of shoring, as well as that of erecting the steel structure that was called for within the building, was entrusted by the defendant to the hands of an independent contractor. Fritz, who was the husband of the plaintiff, was employed by the defendant company as their superintendent to supervise and have charge of all the work which was to be done on the contract of the defendant with the U. G. I. Company. We think that there is no ground for question as to the correctness of that statement. Mr. Abbott, the president of the defendant company, was called as a witness on behalf of the plaintiff as under cross-examination, and he testified distinctly that Fritz was employed as superintendent, and that after full explanations were given to him in regard to the plans and what the contract called for, the whole matter of supervision was placed in his, Fritz's,

hands.   It is true that a witness spoke of Fritz as a fore-
man carpenter, and that another witness testified that he
believed that one or two other employees of the defend-
ant company, who frequently visited the place where the
work was going on, were the superiors of Fritz.   Nobody,
however, testified that any person other than Fritz gave
any orders or directions in regard to the work which was
being done, or that Mr. Abbott or the other persons just
referred to as possible superiors to Fritz, ever inter-
fered with the work or undertook to give directions in re-
gard to how it should be done.   We regard it as entirely
proper to consider Fritz as the active superintendent in
charge of the whole work.

The contract between the defendant and the U. G.
I. Company was made on the sixth of May, 1909, and the
subcontract between the defendant and the contractor
for the shoring was entered into on the fifteenth of May
of the same year.   The removal of the wall which was to
be removed, as before stated, was begun about the time
when the second of these two contracts was entered into,
and the shoring which was intended to support the
upper part of the building was put in place as the work
of removal progressed.   From time to time heavy ma-
terial, such as steel beams and steel columns, were drawn
into the building for the purpose of enabling the steel
structure to be erected.   While such work was in prog-
ress, on the fifteenth of July, shortly after noon, without
warning other than a shaking or tremor of the floor just
before the catastrophe, the southern part of the building
collapsed, the material which fell falling principally in-
side of the limits of the building and not into the street.
Fritz was engaged immediately prior to the accident
upon the second floor of the building, superintending the
operations at that point, but at the moment of the catas-
trophe had gone to the third floor.   Unfortunately, in
the falling of the structure, he was caught and killed.

It is claimed on behalf of the plaintiff that the death
of her husband was due to negligence on the part of the

defendant company, in that Fritz was not furnished with a safe place to perform his duties and because the work of shoring up the building while the alterations were in progress was improperly and negligently done. Various witnesses were called, some of whom were engineers and others were builders, who testified in regard to the shoring. Some of these witnesses said that the usual method of constructing shoring in such a case was to have cross braces between the upright supports. Others said that the use of jacks at the lower end of the shoring timbers was not customary in this locality, and that in their opinion the use of jacks weakened the character of the supports. Still others said that the supporting timbers of the shoring were spliced improperly, and that the wood at the bottom of the timbers was cracked and split and obviously imperfect and unsafe. It appeared also in the evidence that the buildings referred to were old structures and that the old joists at the eastern end rested for only about an inch in the holes made in the party-wall for the joists.

There were two systems of shoring, one upon the outside, in which the upright timbers slanted from the ground upward towards the part of the building which was to be supported, where they were intercepted by other timbers called needles, which entered the building and rested upon an inside system of shores. It is contended by plaintiff's counsel that the collapse of the building before described resulted from failure to construct the shoring properly. As we look at the case, in view of the evidence, it seems to us that there is no other ground upon which the plaintiff's case can be rested with any show of reason than that just stated, and indeed, if the testimony offered at the trial is read, it will appear that that was practically the only phase of the case presented. We see no reason for holding that the defendant was guilty of any negligence in not providing a safe place for his employees to work. There is no evidence which would justify the conclusion that the defendant had any

knowledge or reason to believe that the place was not safe, unless it can be correctly stated that there was knowledge of insecure shoring supports for the building.

Now, upon the motion for judgment n. o. v., we have this to say. We have two reasons for concluding that such a judgment should be entered; first, we are of the opinion that the evidence in the case was insufficient to justify the conclusion that the fall of the building was owing to defects in the shoring. Assuming, as we must, that there was some evidence that the shoring was improperly constructed, that improper construction would have no relevancy in the present treatment of the case, unless there were some substantial reason to believe that the fall of the building was owing to the bad character of the shoring. It is true that some of the witnesses, who had evidently formed rather positive theories in regard to the cause of the calamity, endeavored to interject in their testimony opinions to the effect that the cause of the building's falling was the bad character of the shoring. But such opinions were volunteered and they ought to have no bearing upon the disposition of the present question. We think it quite clear that no reasonable theory or explanation in regard to the cause of the calamity appears from the evidence. It may have been bad shoring, but if so, it would only be a guess which would reach that conclusion. It may have been the original construction of the old building which had joists that extended only a very short distance into the wall. It may have been a weakening of the floors previous to or at the moment of the collapse, from the amount of heavy material put upon them, or by reason of previous hoisting and moving of such materials. Sad as the calamity was to the plaintiff, it seems to us that in all this uncertainty, there can be found no reasonable basis upon which it can be said that the defendants have been shown to have been guilty of negligence which caused the death of the plaintiff's husband.

The second reason which we have for arriving at the

same result is that Fritz was in charge of the whole work which was being prosecuted. As has been previously stated, he was the general superintendent of the whole affair. It was his duty to see that the contracts for the work that had been entered into by the defendant with the U. G. I. Company and with the shoring company were carried out properly; that materials which were used by the subcontractors were of a suitable character, and that the shoring was done in a proper manner. He was placed in his position for that express purpose. He had previously had experience in similar work in the construction of large buildings. Nobody questions his competency. So far as the evidence shows, there was no interference from superiors connected with the defendant company with the manner in which he performed his work. He had equal opportunities of knowledge and information with them, and the fact, if it be a fact, that superior officers of the company must have observed defects in the character of the shoring, or any other defects or sources of danger to the place, could not relieve him of the responsibility which he assumed when he became the superintendent of the work. Doubtless it may be said that the foundation for the opinion that Fritz could not recover under such circumstances, if he were alive, is to be found in the principle that one who voluntarily assumes a risk of an employment cannot recover if he is hurt while running such a risk. That principle would seem to us beyond all question to be particularly applicable to the case of a man who was not merely an ordinary workman, but was in charge of an entire operation.

No doubt there are cases in which it has been held that the question of assumption of risk is oftentimes one for a jury to pass upon. At the same time there are other cases of equal importance in which it has been held as a matter of law that the voluntary taking of a risk relieves an employer from responsibility. We do not think it

necessary to refer to such cases in detail.   Each case must stand by itself.

We have been referred by plaintiff's counsel to the case of Ott v. General Fire Extinguisher Company, 226 Pa. 337, as an authority opposed to the views which we have expressed in this opinion.   The report of the case is very meagre and unsatisfactory, but we think the case in question is readily distinguishable from that now in hand.   It is true that the husband of the plaintiff in that case is described as having been employed to superintend the installing of a fire extinguishing system, but the court, in holding that it was a case for a jury to pass upon, when it appeared that he had been killed by the falling of a tank filled with water which a subcontractor had constructed on the roof of a building, said, "that the design" of the substructure "was an unusual one and had been selected and approved by the defendant."   The selection and approval of the design by the defendant was a critical circumstance in the case, and it seems to us that it entirely distinguishes the authority cited from the case which we have now before us.

Verdict for plaintiff for $4,000.   The court subsequently entered judgment for defendant n. o. v.   Plaintiff appealed.

*G. Von Phul Jones,* with him *Archibald T. Johnson,* for appellant, cited: Foster v. National Steel Company, 216 Pa. 279; Ott v. General Fire Extinguisher Company, 226 Pa. 337; Smith v. York Railways Company, 237 Pa. 280; Stine v. S. Morgan Smith Co., 219 Pa. 145; Barry v. Jones and Laughlin Steel Co., 234 Pa. 367; Metzger v. Cramp, 235 Pa. 17; Miller v. Merritt, 211 Pa. 127.

*Owen J. Roberts,* for appellee, cited: Alexander v. Penna. Water Co., 201 Pa. 252; Price v. L. V. R. R. Co., 202 Pa. 176; Marsh v. L. V. R. R. Co., 206 Pa. 558; Jones v. Scranton Coal Company, 211 Pa. 577; Sandt v.

North Wales Foundry Company, 214 Pa. 215; Clark v. A. Garrison Foundry Company, 219 Pa. 426; Wisniawski v. Carbon Steel Company, 216 Pa. 486; Lane v. Central Iowa Ry. Co., 69 Iowa 443; Dewey v. Chicago & N. W. R. R. Co., 31 Iowa 373; Pioneer Mining & Mfg. Co. v. Thomas, 133 Ala. 279.

PER CURIAM, April 27, 1914:

The majority of the court are of opinion that the judgment should be affirmed for the reasons stated by the learned president judge of the Common Pleas.